**COURT OF APPEALS
DECISION
DATED AND FILED**

**December 27, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2414-CR**

Cir. Ct. No. **2019CF1337**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CORDERO D. COLEMAN,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Dane County: JOHN D. HYLAND, Judge. *Affirmed*.

Before Blanchard, Graham, and Taylor, JJ.

¶1 GRAHAM, J. Cordero Coleman appeals a judgment of conviction and a circuit court order denying his motion for postconviction relief. The primary issue on appeal is whether Coleman's constitutional right to a speedy trial was violated in the context of the COVID-19 pandemic, which precipitated court

shutdowns across the country and resulted in a suspension of jury trials followed by a significant trial backlog in Dane County. We conclude that Coleman's constitutional speedy trial right was not violated, and that his trial counsel was not ineffective for failing to demand a speedy trial or to move to dismiss the criminal charges on speedy trial grounds. We affirm the judgment and order.

## BACKGROUND

¶2 The State charged Coleman with repeated sexual assault of a child. According to the criminal complaint, the victim was a girl who lived in the same apartment building as Coleman's mother. Coleman was friends with the victim's family, and Coleman's mother regularly babysat the victim. The complaint provided detailed allegations about four assaults: two that occurred in the victim's apartment, and two that occurred in Coleman's mother's apartment.

¶3 Coleman was arrested on June 12, 2019, and his trial did not begin until nearly 32 months later on February 7, 2022. Following the lead of the parties, we divide these 32 months into three periods: (1) the "pre-COVID period," which encompasses the time that elapsed between Coleman's arrest and the March 12, 2020 suspension of jury trials in Dane County; (2) the "COVID period," which encompasses the time in 2020 and 2021 in which jury trials were suspended in Dane County as a result of the pandemic; and (3) the "post-COVID backlog period," which encompasses the time between the resumption of jury trials in Dane County and Coleman's 2022 trial. In the course of our discussion, we address the six specific events that occurred between arrest and trial and that the parties characterize as "delays."

**Pre-COVID Period**

¶4      As stated, Coleman was arrested on June 12, 2019, and charges were filed against him shortly thereafter.  Coleman was unable to post bail and remained in custody at that time.

¶5      Coleman's preliminary hearing, which was originally scheduled for June 20, 2019, was postponed three times.  The first postponement occurred on June 20, when Coleman, who had requested the appointment of a public defender, appeared at the hearing without counsel.  The circuit court found good cause to reschedule the hearing, and it granted a continuance to July 2.  The second postponement was on July 2, when the State asked for the hearing to be rescheduled because its witness was unavailable to testify.  The court continued the hearing to July 11, but it heard Coleman's motion on bail, which resulted in Coleman being released from pretrial custody on GPS monitoring.  The third postponement was on July 11, and was due to a conflict in the court's schedule.

¶6      The preliminary hearing finally took place on July 23, 2019.  The circuit court bound the case over for trial, which was later scheduled to take place in January 2020.

¶7      In December 2019, the case was postponed for a fourth time at the prosecutor's request because an expert witness was unable to attend the scheduled trial date.  Coleman did not object to the prosecutor's request, and the circuit court rescheduled the trial for early April 2020.

**COVID Period**

¶8      Coleman's case was postponed for a fifth time on March 12, 2020, due to the onset of COVID-19, a highly infectious disease that was first detected

in December 2019[1] and had "increased 13-fold" since that time.[2] As of March 2020, the World Health Organization declared that COVID-19 had become a global pandemic; it predicted that "the number of cases, the number of deaths, and the number of affected countries [would] climb even higher"; and it warned that "urgent and aggressive action" was needed to curb the spread of COVID-19.[3] Consistent with these warnings, the presiding judge in Dane County issued an order that required that all proceedings involving out-of-custody criminal defendants, including jury trials, be rescheduled until after April 17. Coleman's trial was taken off the calendar in response to the Dane County order.

¶9     The suspension of jury trials continued beyond the date that had originally been set by Dane County. In late March 2020, the Wisconsin governor declared that COVID-19 constituted a public health emergency, the state department of health services issued emergency orders prohibiting public or private gatherings of ten or more people in a single room or confined space, and the Wisconsin Supreme Court ordered that all criminal jury trials that had been scheduled to commence over the following two months be postponed.[4]

---

[1] *Coronavirus Disease (COVID-19) Pandemic*, WORLD HEALTH ORG., https://www.who.int/europe/emergencies/situations/covid-19 (last visited Dec. 11, 2024).

[2] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, WORLD HEALTH ORG. (Mar. 11, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited Dec. 11, 2024).

[3] *Id.*

[4] *See* Supreme Court of Wisconsin, In Re the Matter of Jury Trials During the COVID-19 Pandemic, March 22, 2020 (the "March 22 order"). Copies of the Wisconsin Supreme Court orders discussed in this opinion are available at https://www.wicourts.gov/covid19.htm (last visited Dec. 11, 2024).

¶10    In its order, the Wisconsin Supreme Court explained that, due to the pandemic, "[c]ontinuing to [hold] jury trials would put members of the public, jurors, witnesses, law enforcement personnel, lawyers, judges, and court employees at an unacceptable level of risk to their health and for some at an unacceptable level of risk for the loss of their lives."  The court further explained that the increasing potential for a juror to become ill during trial would create an "unacceptable potential for mistrials," and jurors healthy enough to serve "would likely be distracted by, and anxious" about being in contact with others, creating a "substantial risk" that jurors might cut their deliberations short.  The court made certain determinations that specifically pertained to speedy trial rights.  It determined that "[t]he delay in conducting a jury trial that results from the temporary suspension of jury trials provided in this order is not due to the actions of the government, but is due to factors beyond the government's control[.]"  It also determined that "the ends of justice served by temporarily suspending jury trials in the courts of this state outweigh the interest of the public and the defendant in a speedy trial" under WIS. STAT. § 971.10(3)(a), which addresses statutory speedy trial rights.[5]

¶11    Then, on May 22, 2020, based on the continuing threat that was posed by COVID-19, the Wisconsin Supreme Court indefinitely extended its order suspending jury trials, with the caveat that "individual circuit courts of this state may begin gradually to resume in-person proceedings, including jury trials, on a

---

[5] All references to the Wisconsin Statutes are to the 2021-22 version.

county-by-county basis if the circuit court prepares a plan to do so safely."[6] Jury trials did not resume in Dane County until June 1, 2021, after the Wisconsin Supreme Court issued an order lifting all COVID-related restrictions.[7]

### Post-COVID Backlog Period

¶12    Although jury trials resumed on June 1, 2021, in Dane County, the lengthy suspension of jury trials left significant backlogs, which resulted in the criminal proceedings against Coleman being stalled for a sixth and final time. With many defendants awaiting trial, Coleman's trial was not scheduled to begin until February 7, 2022. The postconviction court later found: "The trial could not be scheduled any sooner because the judicial system was dealing with the backlog related to COVID-19 restrictions coupled with other disruptions due to the lingering pandemic. Coleman himself was not in custody, and trial priority was generally being given to those defendants who were held in pretrial custody."

---

[6] *See* Supreme Court of Wisconsin, In Re the Matter of the Extension of Orders and the Interim Rule Concerning Continuation of Jury Trials, Suspension of Deadlines for Non-Criminal Jury Trials, and Remote Hearing During the COVID-19 Pandemic (May 22, 2020) (extending the March 22, 2020 order and permitting circuit courts to begin resuming in-person proceedings once they had prepared an operational plan to do so safely); Supreme Court of Wisconsin, In Re the Matter of the Extension of Orders and Interim Rule Concerning Continuation of Jury Trials, Suspension of Statutory Deadlines for Non-Criminal Jury Trials, and Remote Hearings During the COVID-19 Pandemic (October 1, 2020) (extending all previously issued orders).

[7] *See* Supreme Court of Wisconsin, In Re the Matter of Modification of Circuit Court and Municipal Accommodations that Were Required Because of the COVID-19 Pandemic (May 21, 2021). In this order, the court stated that lifting the restrictions was warranted based on the increase in the number of vaccinated individuals and the decrease in the number of newly confirmed cases of COVID-19. The court cited the Center for Disease Control's declaration that "[f]ully vaccinated people can resume activities without wearing a mask or physically distancing."

¶13     Coleman did not object to any delay at any point leading up to the February 2022 trial, nor did he argue that there was a violation of his constitutional speedy trial rights.

**The Trial**

¶14     Coleman's trial took place on February 8 and 9, 2022.  At trial, the prosecution presented the testimony of a number of witnesses, including the victim.  The prosecution also introduced a video of a forensic interview of the victim in which she described the assaults.  The defense presented the testimony from Coleman and his brother.  We provide additional detail about the trial evidence as needed in the discussion section below.

¶15     During the jury instruction conference, Coleman's trial counsel represented that he had also intended to present testimony from Coleman's mother, but that she was unavailable to testify because she had passed away several months earlier in September 2021.  Based on her absence, counsel asked the circuit court to instruct the jury that a "necessary and material witness has died due to no fault of Mr. Coleman … [a]nd is not available because of the delay in [the] trial."  For the first time, counsel asserted that the delay in holding the trial was a "violation of Mr. Coleman's right to a speedy trial" and "[a]rguably" the "State of Wisconsin's fault."

¶16     The circuit court determined that it was not appropriate to give the missing witness instruction that trial counsel requested.  However, the court indicated that, if both sides agreed, it would allow the introduction of a police report that summarized the statements that Coleman's mother purportedly made to a detective at the time of Coleman's arrest.  The prosecutor did not appear to

object to this proposed solution, but Coleman's trial counsel did not take up the court's offer to introduce the police report.

¶17    The jury found Coleman guilty of repeated sexual assault of a child.

## The Postconviction Motion

¶18    Coleman moved for postconviction relief.  In his motion, Coleman argued that his constitutional right to a speedy trial had been violated, and that his trial counsel was ineffective for not objecting to the delay and moving for dismissal of the criminal charges on speedy trial grounds.[8]

¶19    The postconviction court held a ***Machner*** hearing at which Coleman's trial counsel testified as follows.[9]  "[E]arly on in the representation," when Coleman was still in custody, counsel advised Coleman of his statutory right to demand a speedy trial.  *See* WIS. STAT. § 971.10.  However, during the pandemic, courts were routinely finding cause to set matters over, and at some point filing speedy trial demands became a "waste of paper."  With respect to the constitutional right to a speedy trial, counsel did not "contemplate … raising a constitutional violation of the speedy trial concept" during the COVID period or the post-COVID backlog period.

---

[8]  Coleman also argued that he was entitled to a new trial in the interest of justice, but he does not renew this argument on appeal and we address it no further.

[9]  ***State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).  A ***Machner*** hearing is "[t]he evidentiary hearing to evaluate counsel's effectiveness, which includes counsel's testimony to explain [counsel's] handling of the case." ***State v. Balliette***, 2011 WI 79, ¶31, 336 Wis. 2d 358, 805 N.W.2d 334.

¶20    Coleman also testified at the hearing.  He testified that he had been nervous and anxious in the lead-up to the trial because he "didn't know what was going to happen," so he "just kind of wanted to … get it over with as soon as possible."  Coleman did not specifically recall whether trial counsel advised him about the statutory or constitutional right to a speedy trial, but if counsel had told him, Coleman would have wanted to pursue those rights.

¶21    The postconviction court denied Coleman's motion.  Coleman appeals.

## DISCUSSION

¶22    We address Coleman's constitutional speedy trial and ineffective assistance of counsel claims in that order.

### I. The Speedy Trial Claim

¶23    The federal and state constitutions both guarantee an accused the right to a speedy trial.  *State v. Urdahl*, 2005 WI App 191, ¶11, 286 Wis. 2d 476, 704 N.W.2d 324 (citing U.S. CONST. amend. VI; WIS. CONST. art. I, § 7).  The constitutional right to a speedy trial has "its roots at the very foundation of our English law heritage" and is "as fundamental as any of the rights secured by the Sixth Amendment."  *Klopfer v. State of N.C.*, 386 U.S. 213, 223 (1967). "Whether this right has been violated is a question of law that we review independently" from the circuit court, accepting as true all of the court's factual findings "unless they are clearly erroneous."  *State v. Provost*, 2020 WI App 21, ¶25, 392 Wis. 2d 262, 944 N.W.2d 23; *Urdahl*, 286 Wis. 2d 476, ¶10.

¶24    To assess whether a defendant's constitutional right to a speedy trial has been violated, we apply the four-part balancing test articulated in *Barker v.*

9

*Wingo*, 407 U.S. 514 (1972). That test considers: (1) the total time that elapsed between the arrest and the defendant's trial; (2) the reasons for any delays; (3) the defendant's assertion of the speedy trial right; and (4) any prejudice to the defendant as a result of the delay. *See Day v. State*, 61 Wis. 2d 236, 244, 212 N.W.2d 489 (1973). "[N]one of the four factors is 'either a necessary or sufficient condition.'" *Hadley v. State*, 66 Wis. 2d 350, 363, 225 N.W.2d 461 (1975) (citing *Barker*, 407 U.S. at 533). Instead, we balance these factors in light of the relevant circumstances of the case. *Urdahl*, 286 Wis. 2d 476, ¶11 (citing *Barker*, 407 U.S. at 530). If, under the totality of the circumstances, the defendant was denied the constitutional right to a speedy trial, the criminal charges must be dismissed to remedy the violation. *Id.* (citing *Barker*, 407 U.S. at 522).

¶25 Coleman asserts that the application of the *Barker* factors to his case demonstrates that he was denied the constitutional right to a speedy trial and that his conviction should be reversed and the charges dismissed on that basis. For reasons we now explain, we disagree.

## A. Total Time Elapsed

¶26 As mentioned, the first *Barker* factor requires us to consider the total amount of time that has elapsed between the defendant's arrest and trial. *State v. Borhegyi*, 222 Wis. 2d 506, 511, 588 N.W.2d 89 (Ct. App. 1998). Although other cases may refer to this factor as the "length of the delay,"[10] we do not use that phrase here because, in our view, it can be misleading to use the term "delay" in

---

[10] *See, e.g.*, *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *State v. Urdahl*, 2005 WI App 191, ¶11, 286 Wis. 2d 476, 704 N.W.2d 324; *State v. Borhegyi*, 222 Wis. 2d 506, 511-12, 588 N.W.2d 89 (Ct. App. 1998); *State v. Ramirez*, 2024 WI App 28, ¶¶20-23, 412 Wis. 2d 55, 8 N.W.3d 74 (petition for review granted).

an analysis of the first **Barker** factor. This is because, as discussed below, the second **Barker** factor ascribes a different meaning to that term, and some amount of time between arrest and trial does not constitute "delay" for purposes of the analysis.[11]

¶27 Our examination of the total amount of time that elapsed between arrest and trial serves "two roles." **Urdahl**, 286 Wis. 2d 476, ¶12. The first role is to function as a triggering mechanism used to determine whether the total amount of time is presumptively prejudicial. **Borhegyi**, 222 Wis. 2d at 510 (if the total amount of time is not presumptively prejudicial, it is unnecessary to inquire into the other **Barker** factors). Here, we agree with the parties that the nearly 32 months that elapsed between Coleman's arrest and his jury trial was presumptively prejudicial. **Urdahl**, 286 Wis. 2d 476, ¶12 (generally, a time to trial of more than one year is considered to be presumptively prejudicial).

¶28 This brings us to the second role. If the total amount of time that elapsed between the defendant's arrest and trial is presumptively prejudicial, further examination of the remaining **Barker** factors is warranted. **Borhegyi**, 222 Wis. 2d at 510. In such cases, we consider the total time to trial as part of our evaluation of all of the factors that comprise the **Barker** balancing test. **State v. Ramirez**, 2024 WI App 28, ¶22, 412 Wis. 2d 55, 8 N.W.3d 74 (petition for review granted). Specifically, we look at "the extent to which the [time to trial] stretches

---

[11] *See infra*, ¶32. There, we address **Scarbrough v. State**, 76 Wis. 2d 87, 101, 250 N.W.2d 354 (1977), which acknowledges that some amount of time between arrest and trial is "time required for the orderly administration of criminal justice," and does not count as delay for purposes of the second **Barker** factor.

beyond the bare minimum needed to trigger judicial examination of the claim." *Urdahl*, 286 Wis. 2d 476, ¶12 (citation omitted).

¶29    Here, the total amount of time between Coleman's arrest and trial was significantly longer than "the [one-year] bare minimum needed to trigger judicial examination of the claim." *Id.* It was also significantly longer than the time that elapsed in other published cases in which a Wisconsin appellate court determined that a defendant's speedy trial rights were violated. *See Borhegyi*, 222 Wis. 2d at 512 (17 months between arrest and trial); *Hadley*, 66 Wis. 2d at 363, (18 months between arrest and trial); *State v. Ziegenhagen*, 73 Wis. 2d 656, 666, 245 N.W.2d 656 (1976) (25 months between arrest and trial); *but see State v. Lemay*, 155 Wis. 2d 202, 204, 455 N.W.2d 233 (1990) (no speedy trial violation in a case in which 37 months elapsed between arrest and trial); *Provost*, 392 Wis. 2d 262 (no violation in a case with a 35-month time to trial); *Urdahl*, 286 Wis. 2d 476 (no violation in a case with a 30-month time to trial).

¶30    It is true that the circumstances in this case are readily distinguishable from any Wisconsin appeal in which a court has determined that a defendant's speedy trial rights were violated. Here, the only reason that the time to trial stretched beyond a year was a public health crisis that resulted in the suspension of all jury trials in Dane County, and none of the delay in the cases cited above was precipitated by a remotely comparable event. Yet, we do not evaluate the reasons for the delay in our assessment of the first *Barker* factor. The first *Barker* factor focuses exclusively on the total time between arrest and trial, and here, it weighs in favor of Coleman's claim.

**B. Reasons for the Delay**

¶31 We now address the second *Barker* factor, which evaluates the reasons for any delay. In analyzing this factor, we determine whether the State is responsible for any periods of delay and, if so, we assign weight to the reasons the State gives for those delays. *Ziegenhagen*, 73 Wis. 2d at 666-67. Our inquiry focuses on any delay that was caused by the State because "a defendant has no duty to bring himself to trial—that duty is on the State." *Id.* at 668.

¶32 As mentioned, there are some periods of time between arrest and trial that do not constitute "delay" at all; those periods therefore fall out of our discussion of the second *Barker* factor. More specifically, the time "required for the orderly administration of criminal justice,"—that is the time needed to prepare for trial in the ordinary course, which includes events such as the initial appearance, the preliminary hearing, the exchange of discovery materials, and pretrial motion hearings—is not considered "delay" for purposes of the second *Barker* factor, provided that the events occur "expeditiously [and] without delay." *Scarbrough v. State*, 76 Wis. 2d 87, 101, 100, 250 N.W.2d 354 (1977).

¶33 Other periods of time—beyond the amount of time that is needed for the orderly administration of criminal justice—is considered delay and may be attributed to the State. We attribute a delay to the State if it was caused by members of the prosecution team or other government actors, including but not limited to employees in the clerk's office or elements of the court system itself such as the circuit court's calendar. *Ziegenhagen*, 73 Wis. 2d at 666-67 ("the government as an institution is charged with the duty of assuring a defendant a speedy trial"). We do not attribute delays that were caused by the defendant to the State. *Urdahl*, 286 Wis. 2d 476, ¶26.

¶34     Once we have attributed a delay to the State, we consider the degree to which the reasons for the delay should be weighed against the State. *Borhegyi*, 222 Wis. 2d at 512.  Prior Wisconsin cases have recognized the following three categories of State-attributed delay.  A "deliberate attempt [by government actors] to delay the trial in order to hamper the defense" will be "weighed heavily against the [State]." *Id.* at 512-13 (citing *Barker*, 407 U.S. at 531).  "[M]ore neutral" reasons, such as mere "negligence" by government actors or "overcrowded courts," are weighed against the State, albeit "less heavily." *Id.* at 512 (citing *Barker*, 407 U.S. at 531).  Finally, delays that are attributed to the State but caused by so-called "valid" reasons are given no weight at all. *Scarbrough*, 76 Wis. 2d at 95-96.  Under Wisconsin law, a reason for a delay is "valid" and assigned no weight if the delay is "caused by something intrinsic to the case itself," such as "the inability of the State to produce a necessary witness." *Hadley*, 66 Wis. 2d at 362.[12]

¶35     As would be expected, our discussion of the second *Barker* factor does not account for all of the 971 days that elapsed between Coleman's arrest and his trial.  This is because, as mentioned, not every day that elapses between an arrest and trial constitutes "delay" for the purposes of the second *Barker* factor.  Rather, here, significant portions of the pre-COVID period do not count as delay and are not attributed to the State because they encompass time that was "required for the orderly administration of justice." *See Scarbrough*, 76 Wis. 2d at 101.

---

[12] We pause to caution that, as we discuss below, the meaning of some of the terms that are used in the case law to address the constitutional speedy trial right, such as reasons that are "neutral" and "valid," or delays that are "intrinsic to the case," are not intuitive, and may require careful application.

¶36    Instead, our discussion of the second *Barker* factor focuses on the six events that are recounted in the background section, which the parties identify as delays.  We first address the four occasions during the pre-COVID period in which a previously scheduled court date was continued or rescheduled.  We then discuss the delay that occurred during the COVID period, when jury trials were suspended in Dane County.  And finally, we address the delay that occurred in the COVID-backlog period, after pandemic-related restrictions were lifted and jury trials resumed in Dane County.

### 1.  The Pre-COVID Period (June 14, 2019, to March 12, 2020)

### a.  The First Continuance (June 20 to July 2, 2019)

¶37    We begin with the 12 days that elapsed after Coleman appeared at the June 20, 2019 preliminary hearing without counsel, which resulted in the circuit court rescheduling the hearing for July 2.  The postconviction court attributed these 12 days to Coleman because he "requested a continuance of the originally scheduled preliminary hearing so he would have more time to engage an attorney."

¶38    Coleman argues that the postconviction court's finding is clearly erroneous, but he does not develop an argument explaining how the court erred. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (a court need not consider arguments that are unsupported by legal citations or are otherwise undeveloped).  At most, he asserts that it was not his fault that no attorney was present at the hearing to represent him.

¶39    Even if we were to agree that the postconviction court erred by attributing this 12-day period to Coleman, the court would not have erred by

declining to attribute it to the State. Although it is "the responsibility of government actors to appoint counsel for indigent defendants," and although Coleman ultimately obtained representation through the office of the state public defender (SPD), the process of applying for and obtaining such representation is not instantaneous. *See* **Ramirez**, 412 Wis. 2d 55, ¶36 & n.9. Coleman does not argue that SPD officials or other government actors delayed the appointment, nor does he identify anything in the record that suggests that the time it took to make the appointment was unreasonable.[13] We conclude that, at most, these 12 days constitute "time required for the orderly administration of justice," and therefore this period does not count as a delay in our analysis of the second **Barker** factor.

### b. The Second Continuance (July 2 to July 11, 2019)

¶40     We now address the 9 days that elapsed after the lead detective was unavailable to testify on July 2, 2019, and the preliminary hearing was continued until July 11. The prosecution requested the continuance and we therefore attribute this delay to the State; however, as we explain below, we do not weigh this delay against the State.

¶41     The postconviction court found that the July 2 hearing was rescheduled due to "witness unavailability" which, the court determined, was a reason for delay that was "intrinsic to the case." *See* **Hadley**, 66 Wis. 2d at 362 (if the delay "is intrinsic to the case itself," it is valid and assigned no weight). There

---

[13] Based on the record, it appears that the SPD sought to appoint counsel for Coleman on the day of his initial appearance, June 14, 2019, but at that point it was determined that he did not qualify for SPD representation. It appears that Coleman provided additional information to the SPD, and he was determined to qualify and was appointed SPD counsel within 11 days of his initial request.

is record support for the court's determination and Coleman does not argue that the determination was erroneous, nor does he engage in any way with case law such as **Hadley** that addresses what it means for a delay to be "intrinsic to the case." *See* **Pettit**, 171 Wis. 2d at 646-47. We therefore conclude that this was a "valid" reason for the delay that is not weighed against the State.

### c. The Third Continuance (July 11 to July 23, 2019)

¶42 The next delay in holding the preliminary hearing occurred when the hearing was continued until July 23, 2019. The postconviction court found that the hearing was rescheduled due to a conflict with the circuit court's schedule, and it determined that "the delay was the result of an overcrowded court." We agree with the parties that this 12-day delay was caused by a "neutral" reason that is attributed to the State, but is weighed less heavily than a deliberate attempt to delay the trial. *See* **Urdahl**, 286 Wis. 2d 476, ¶26.

### d. Rescheduling of January 2020 Trial (January 6, 2020, to March 12, 2020)

¶43 We now address the final delay that occurred prior to the onset of the COVID-19 pandemic. This delay encompasses the 66 days (roughly nine weeks) between when the jury trial was scheduled to commence on January 6, 2020, and the March 12, 2020 suspension of jury trials. As discussed above, after the minor delays in holding the preliminary hearing, the case appears to have been on track for the scheduled January 2020 trial. However, in December 2019, the prosecutor represented that one of the State's experts was not available during the scheduled trial dates and requested a continuance. Coleman did not object to the request, and the circuit court rescheduled the trial for April 2020.

¶44 Similar to our analysis above, we attribute this delay, which was requested by the prosecution, to the State, but we do not weigh it against the State. The postconviction court found that the trial was rescheduled due to an unavailable witness, and it determined that the reason for the delay was "intrinsic to the case." There is record support for the court's determination, and Coleman does not argue that it was erroneous. We therefore conclude that there was a "valid" reason for the delay and do not weigh it against the State.

### 2. Delay in the COVID Period (March 12, 2020, to June 1, 2021)

¶45 We now address the 466 days (roughly 15 months) in which jury trials were suspended in Dane County. The parties dispute whether this period of delay should be attributed to the State, and if so, how much it should weigh against the State. Coleman argues that the delay should be attributed to and weighed, perhaps heavily, against the State. By contrast, the State contends that the delay should not be attributed to the State, or if it is, it should be given no weight. For reasons we now explain, we conclude that this period of time constitutes a delay and is properly attributed to the State, but we give it no weight against the State.

¶46 We begin by explaining why we attribute the delay caused by the suspension of jury trials to the State. As we have interpreted *Barker*, a court must attribute a period of delay to the party that caused the delay. *See **Ramirez***, 412 Wis. 2d 55, ¶25 ("A period of delay will be attributed to the State if it was caused by government actors …."). Although neither the State nor Coleman caused the COVID-19 pandemic that precipitated the suspension of jury trials, the suspension was ordered by government actors—specifically the Wisconsin Supreme Court and the presiding judge of the Dane County Circuit Court. Because the

government put in place the orders that delayed Coleman's trial, the delay is attributed to the State. *See* ***Ziegenhagen***, 73 Wis. 2d 656, 666-67 ("[T]he government as an institution is charged with the duty of assuring a defendant a speedy trial. It is irrelevant whether the delay occurred in the clerk's office, the prosecutor's office, or the judiciary.").

¶47 Having attributed the delay to the State, we now turn to the degree that we should weigh the reasons for the delay against the State. At the outset, we observe that COVID-19-related delays do not fit neatly into any of the three categories that have previously been recognized by Wisconsin courts. *See supra*, ¶34. More specifically, the decision to suspend jury trials due to the spread of a deadly and highly contagious virus does not fit into the first category, because it is not a "deliberate attempt to delay the trial in order to hamper the defense," ***Barker***, 407 U.S. at 531, or a "cavalier disregard" for the defendant's speedy trial rights, ***Borhegyi***, 222 Wis. at 513-14, and it does not fit into the second category, which addresses delays caused by "negligence" on the government's part or "overcrowded courts." ***Barker***, 407 U.S. at 531.

¶48 Nor does the government's response to the pandemic fit within the third category, which addresses "valid" reasons for delay. *See* ***Hadley***, 66 Wis. 2d at 362. Although many would consider a demonstrated need to suspend jury trials to protect the health and safety of trial participants to be a "valid" reason to postpone a trial, that is not how that term has been used in Wisconsin case law. As mentioned, the term "valid" has been limited to those delays that are "*intrinsic* to the case itself,*" **id.*** (emphasis added), and here, the delay was caused by the government response to a public health emergency that was indisputably *extrinsic* to the case against Coleman.

¶49    There are no published Wisconsin cases that address delays that were caused by a government response to anything that is remotely comparable to the pandemic at issue here. Under the circumstances, Coleman argues that we should weigh the delay against the State. He acknowledges that "the pandemic was an unprecedented time," but argues that "[i]t is not well-established" that the State can "subvert" his "constitutional right to a speedy trial … in such a manner."

¶50    It is true that there is no binding precedent that addresses whether criminal trials can be delayed due to a public health emergency that results in the temporary suspension of jury trials. However, the *Barker* Court was clear that the speedy trial analysis should be based on the particular circumstances of each case. *See Barker*, 407 U.S. at 522 ("[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."). Indeed, *Barker* expressly acknowledges that future cases might require an analysis of additional factors, beyond the circumstances that the Court addressed in *Barker*. *See id.* at 530 ("We can do little more than identify *some of the factors* which courts should assess in determining whether a particular defendant has been deprived of [the] right." (emphasis added)).

¶51    Therefore, contrary to Coleman's argument, the absence of "well-established" law that addresses this particular reason for delay is not critical to our analysis. In the absence of published Wisconsin cases addressing a speedy trial claim in the context of the COVID-19 pandemic, we consult case law from other jurisdictions. *See State v. Harvey*, 2006 WI App 26, ¶20 n.7, 289 Wis. 2d 222,

710 N.W.2d 482 ("We may look to other jurisdictions for persuasive authority where there are no Wisconsin cases directly on point.").[14]

¶52  We begin by considering cases that address trial delays that were caused by other unprecedented events beyond the control of the government.[15]  In cases that addressed delays caused by the eruption of Mount St. Helens in Washington, the 9-11 attack on the World Trade Center in New York, and Hurricane Katrina in Louisiana, the reasons for delay have not been given any weight against the government.  *See **Furlow v. United States***, 644 F.2d 764, 767-68 (9th Cir. 1981) (addressing a two-week delay that was caused by the eruption of Mount St. Helens, and explaining that the "cloud of volcanic dust" that followed the eruption was a "state of emergency" that "interrupted transportation [and] communication" and "affect[ed] the abilities of jurors, witnesses, counsel, [and] officials to attend the trial"); ***United States v. Correa***, 182 F. Supp. 2d 326, 326-27, 329 (S.D.N.Y. 2001) (considering a three-week delay in a hearing, originally scheduled for September 11, 2001, that was rescheduled due to the attack on the World Trade Center, which occurred "less than half a mile" from the courthouse, caused the courthouse to be evacuated, communication services to be

---

[14] In one unpublished case that is citable for persuasive value, *see* WIS. STAT. § 809.23(3)(b), this court briefly analyzed a delay that was caused by COVID-19 and other factors.  ***State v. Guerra***, No. 2022AP2098, unpublished slip op. ¶16 (WI App July 19, 2023) ("[T]he record demonstrates that these delays were due to the court's congested calendar and the COVID-19 pandemic and its significant impact on the judicial system.  Therefore, although this factor is weighted against the State, it is not weighted heavily.").

[15] The two federal cases we discuss in this paragraph addressed delays in the context of the federal Speedy Trial Act, 18 U.S.C. § 3164.  Even so, we consider these cases to have some persuasive value because, like the constitutional analysis under ***Barker***, courts analyzing claims under the federal act consider the reasons for specific delays and if those delays should be counted against the government.  *See* 18 U.S.C. § 3161(h) (identifying certain "periods of delay" that "shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence").

disrupted, and law enforcement agents on the case to be redeployed to emergency services); *State v. Hamilton*, 980 So. 2d 147, 150, 152 (La. Ct. App. 2008) (considering trial delays caused by Hurricane Katrina, which wreaked havoc on the court system, resulting in a situation in which "there were no juries, courtrooms, or deputies to provide adequate security," and "parties were often unable to procure or even ascertain the state of water-soaked records and evidence").[16]  In those cases, the courts determined that the temporary suspension of court activities was justified due to a practical inability to hold court proceedings under the circumstances and to protect the health or safety of trial participants.

¶53    We now turn to the cases from other jurisdictions that address constitutional speedy trial rights in the context of the COVID-19 pandemic.  Many of these cases conclude that the pandemic provided a "valid" reason for court closures, and that these delays should not be weighed against the state.[17]  Although this use of the term "valid" is not consistent with the meaning that Wisconsin cases have given to that term, *see supra*, ¶48, we agree with the underlying logic

---

[16] Ultimately, the Louisiana Court of Appeals determined that these delays were beyond the control of the state; and therefore, should not be attributed to the state. *See State v. Shannon*, 17 So. 3d 1061, 1065 (La. Ct. App. 2009) (discussing various decisions that analyzed delays occasioned by Hurricane Katrina).

[17] *See Ali v. Commonwealth*, 872 S.E.2d 662, 675 (Va. Ct. App. 2022) ("The *Barker* framework and persuasive case authority support the trial court's conclusion that the pandemic justified appropriate delay under the [] category[ that] encompasses 'valid' reasons for the delay that are not directly attributable to the government."); *State v. Brown*, 964 N.W.2d 682, 693 (Ne. 2021) ("'[A] valid reason'" is "justified," and "we determine[] … that the pandemic-related delays … were for a 'valid reason.'"); *McCartney v. State*, No. 3D22-1527, ___ So. 3d ___ (Fla. Ct. App. 2024) ("The next series of delays were due to responsive measures designed to preserve public safety during the COVID-19 pandemic.  It is well settled that a crisis or emergency constitutes a constitutionally valid reason for postponing trial."  "Hence, we conclude these delays were justified under *Barker* and should not be weighed against the [s]tate at all.").

22

of these cases about why the reason for delay should not be weighed against the state.

¶54 For instance, in **State v. Paige**, 977 N.W.2d 829, 838-40 (Minn. 2022), the court considered delays that resulted from an emergency order suspending jury trials in light of the COVID-19 pandemic. The order outlined the various challenges in holding jury trials during the pandemic, such as the then-existing shortage of personal protective equipment, the practical impossibility of spacing "individuals, including court staff, parties, witnesses and jurors, 6 feet apart," and the difficulty in finding "a sufficient number of jurors willing and able to perform jury service" "in light of the ongoing public health risk from the pandemic." **Id.** at 836 (emphasis omitted). Considering the "deadly" nature of the virus and the fact that "the [government] had no control" over its transmission, the court determined that the delay occasioned by the order was justified because the government was responding to a "global health emergency." *See **id.*** at 840. As such, the court did not weigh the delay against the state. **Id.**

¶55 The court reached a similar conclusion in **Labbee v. State**, 869 S.E.2d 520 (Ga Ct. App. 2022). There, the chief justice of the state entered an "emergency order" that suspended jury trials in response to the pandemic. **Id.** at 526, 530. The **Labee** court reasoned that "the pandemic [was] a 'catastrophic and unique event beyond either party's control,'" and the resulting delays, while occasioned by a government order, did not weigh against the state. **Id.** at 529-30 (citation omitted).

¶56 As shown by our review of the case law, when a defendant's trial is delayed by an unprecedented and catastrophic event such as those described above, there may be good reasons for not weighing the delay against the state. We

23

are persuaded that this is the correct approach because the "ultimate responsibility for" the events that caused the public emergency does not "rest with the government," *see* **Barker**, 407 U.S. at 531, and refusing to recognize this in a speedy trial analysis might have the effect of discouraging the government from taking necessary steps to protect the public, which can include temporary suspensions of jury trials. Accordingly, based on our review of the above case law, we identify a fourth category of reasons for state-attributed delay, which encompasses those delays that are caused by a reasonable government response to a legitimate public emergency.

¶57 Turning to the 466-day delay before us, we conclude that it should not weigh against the State. Like the public emergencies described above, COVID-19's effect reached well beyond the parties and the court system itself. At the time the Wisconsin Supreme Court suspended jury trials statewide, the World Health Organization had declared that COVID-19 was a "global pandemic," and in Wisconsin specifically, the governor declared that COVID-19 had created a state of emergency based on its "uncontrolled spread."[18] Moreover, the court reasonably determined that the specific qualities of the COVID-19 virus, as it was best understood at the time, made it unsafe for jury trials to proceed as scheduled. Specifically, the court explained that "continuing to have jury trials would put members of the public, jurors, witnesses, law enforcement personnel, lawyers, judges, and court employees at an unacceptable level of risk to their health and for some at an unacceptable level of risk for the loss of their lives." It is also clear

---

[18] We take judicial notice of Governor Evers' Executive Order #95, available at https://evers.wi.gov/Documents/COVID19/EO095-DeclaringPublicHealthEmergencyNov2020.pdf (last visited Dec. 12, 2024). *See* WIS. STAT. § 902.03(1)(b) (Wisconsin courts may take judicial notice of orders of state agencies).

that the court system could not adequately respond to COVID-19 with the resources it had at hand, and we do not see, nor does Coleman argue, that the court system could have taken less drastic measures under the circumstances. *See Paige*, 977 N.W.2d at 840 (COVID-19 is "a deadly and virulent illness over which the court had no control"); *Labbee*, 869 S.E.2d at 529 ("the pandemic is a 'catastrophic and unique event beyond either party's control'" (citation omitted)). Accordingly, we conclude that the temporary suspension of jury trials was justified due to the COVID-19 public health emergency, and therefore, we do not weigh this 466-day delay against the State.

### 3. Post-COVID Backlog Delays (June 1, 2021, to February 7, 2022)

¶58    We now turn to the final delay in Coleman's case, which encompasses the 251 days (roughly eight months) that elapsed between the date that jury trials resumed in Dane County, and the commencement of Coleman's jury trial. As mentioned, jury trials resumed in Dane County on June 1, 2021, after the Wisconsin Supreme Court lifted all COVID-related restrictions. Shortly thereafter, the circuit court scheduled Coleman's trial to commence on February 7, 2022. As mentioned above, the postconviction court found that the circuit court could not have scheduled Coleman's trial "any sooner because the judicial system was dealing with the backlog related to COVID-19 restrictions coupled with other disruptions due to the lingering pandemic," and "trial priority was generally being given to defendants who were held in pretrial custody." It is undisputed that Coleman was not in custody at that time, and on appeal, he does not dispute the postconviction court's finding that a system of trial priority was in place, or argue that this system was inappropriate.

¶59     Contrary to the argument that the State advances on appeal, we conclude that this delay should be attributed to the State because the court system was responsible for scheduling Coleman's trial.  And, for reasons we now explain, we weigh this delay against the State, albeit less heavily than some other causes of delay.

¶60     Coleman's trial was delayed due to what the postconviction court described as backlog, and under the second **Barker** factor, overcrowded courts are typically considered a "neutral" reason for delay that "should be weighted less heavily."  *See* **Barker**, 407 U.S. at 531.  Backlogs are generally the result of an insufficiency of resources, and the "ultimate responsibility for such circumstances must rest with the government rather than the defendant."  **Id.**  Had the court system possessed an enormity of additional resources, including additional judges, prosecutors, public defenders, court reporters, other court personnel, and facilities, it may have been possible to hold Coleman's trial earlier.

¶61     At the same time, we recognize that the backlog at issue in this case is distinct from the types of backlogs that are typically considered under the second **Barker** factor.  Here, the backlog was the inevitable result of the court system's efforts to reasonably respond to the pandemic, which was an emergency that justified the suspension of jury trials.  It would not be appropriate to fault the court system for the consequences that arose from the decisions to suspend jury trials, especially when the record suggests that the court system used the resources it possessed "as efficiently and as justly as possible" under the circumstances. *See* **Hadley**, 66 Wis. 2d at 369.  Therefore, although we weigh these 251 days against the State, we do not do so heavily.

26

#### 4. Summarizing and Weighing the Reasons for the Delay

¶62    In summary, 32 months, comprising 971 days, elapsed between Coleman's arrest and his trial. Of these 971 days, we weigh 263 days against the State and, as we have explained, we do so not heavily. These delays consist of the 12 days that elapsed when Coleman's preliminary hearing was rescheduled due to court overcrowding, and the 251 days that elapsed after jury trials resumed in Dane County. As illustrated above, none of these circumstances constitute a "deliberate attempt to delay the trial in order to hamper the defense." *Barker*, 407 U.S. at 531. Instead, the record demonstrates quite the opposite—that the State attempted to hold Coleman's trial as promptly as possible under the circumstances.

¶63    With respect to the remaining 708 days, we do not weigh any of this time against the State. The vast majority of this time, 446 days, was the result of the COVID-19 pandemic and the court orders that suspended jury trials. Of the remaining days, very little of it is even considered delay at all—instead, the vast majority is "time required for the orderly administration of criminal justice." *See Scarbrough*, 76 Wis. 2d at 101.

#### C. Assertion of the Speedy Trial Right

¶64    The third *Barker* factor directs us to consider whether Coleman made any assertions of his statutory or constitutional right to a speedy trial. *Urdahl*, 286 Wis. 2d 476, ¶11; *see also Hadley*, 66 Wis. 2d at 354-55, 360-61 (considering the defendant's repeated statutory and constitutional speedy trial demands). A constitutional speedy trial violation can occur even if the defendant does not assert the right to a speedy trial—as our supreme court has explained, a defendant does not waive the constitutional right to a speedy trial by failing to demand it. *Hatcher v. State*, 83 Wis. 2d 559, 568, 266 N.W.2d 320 (1978). In

those cases in which the defendant does demand a speedy trial, that assertion "is entitled to strong evidentiary weight," *Barker*, 407 U.S. at 531-32, and may itself be "probative of prejudice," *Hadley*, 66 Wis. 2d at 364. By contrast, a failure to demand a speedy trial undermines a speedy trial claim "if the evidence shows that the defendant was deliberately delaying the trial to avoid the day of reckoning." *See Ramirez*, 412 Wis. 2d 55, ¶76 (citing *Hadley*, 66 Wis. 2d at 361).

¶65 As noted, Coleman did not assert his right to a speedy trial during the nearly 32 months his case was pending. In fact, the first time Coleman's speedy trial rights were referenced was at trial, when counsel asked the circuit court to give a "missing witness" instruction that would have been beneficial to Coleman's defense. Coleman appears to concede that the third *Barker* factor does not weigh in his favor—he acknowledges that waiting to raise the speedy trial right "until the trial has already begun or is nearly over is untimely," even if that is not "fatal to the claim." The State, by contrast, asks us to weigh this factor heavily against Coleman.

¶66 We agree with the parties that this factor weighs against Coleman's claim. However, we do not weigh this factor "heavily" for two reasons.

¶67 First, there is no suggestion that Coleman was "deliberately delaying the trial to avoid the day of reckoning." *See id.* Aside from his request for a continuance of the preliminary hearing so that he could be represented by counsel, Coleman did not make any requests that delayed his trial. It is true that Coleman did not object to some of the State's requests that postponed his case, but without more, we do not conclude that this demonstrates a desire for delay on Coleman's part. Unlike in *Barker*, in which the record "strongly indicate[d]" that the defendant acquiesced to the State's repeated requests for continuances in hopes

28

that a key witness would be unable to testify against him, there is no indication that Coleman's failure to object was calculated, or that it is evidence of willful delay on Coleman's part. *Barker*, 407 U.S. at 535-36; *Hadley*, 66 Wis. 2d at 359-60 (a defendant's willingness to "tolerate some delay because he finds it reasonable and helpful in preparing" for trial should not be interpreted as "willful delay").

¶68    Second, as we discuss below, Coleman contends that the reason he failed to assert his speedy trial rights was because his trial counsel was constitutionally ineffective.  Specifically, Coleman argues that he does not recall counsel informing him of his statutory or constitutional speedy trial rights, and that had counsel done so, Coleman would have asked counsel to assert those rights.  The responsibility to safeguard the accused's rights rests with counsel, not the accused.  *See United States v. Cronic*, 466 U.S. 648, 653 (1984) ("Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects [the] ability to assert any other rights [they] may have." (citation omitted)).  If Coleman's failure to demand a speedy trial was due to his ignorance about his ability to assert that right—a factual question that we do not resolve here—then it would stand to reason that Coleman's failure to assert the right should not be given significant weight in our analysis.

## D.  Prejudice

¶69    The fourth *Barker* factor directs us to consider whether Coleman was prejudiced by the delay in bringing him to trial.  *Urdahl*, 286 Wis. 2d 476, ¶11.  When assessing this factor, we generally consider "the three interests that the right to a speedy trial protects:  prevention of oppressive pretrial incarceration,

prevention of anxiety and concern by the accused, and prevention of impairment of defense." *Id.*, ¶34.

¶70    Coleman does not argue that he suffered prejudice in the form of "oppressive pretrial incarceration." *Id.* Nor could he—Coleman was released from custody and was out on bond for 31 of the 32 months that his case was pending.

¶71    Nor has Coleman persuaded us that he suffered significant prejudice in the form of pretrial "anxiety and concern." At most, Coleman testified that he was nervous and anxious because he "didn't know what was going to happen" at trial, and he "just kind of wanted to … get it over with as soon as possible." If credited, this testimony may establish that Coleman was not intentionally attempting to delay the trial, but it does not demonstrate prejudice "beyond the generalized claims of anxiety, concern, and panic that are common to many who are charged with criminal offenses." *Ramirez*, 412 Wis. 2d 55, ¶86; *see also Urdahl*, 286 Wis. 2d 476, ¶35.

¶72    Coleman's arguments about prejudice rest primarily on the third interest protected by the speedy trial right, which is to prevent the impairment of a defendant's ability to present a defense. *Barker*, 407 U.S. at 532. "The defense may be impaired 'if witnesses die or disappear during a delay; if defense witnesses are unable to recall accurately events of the distant past; or if a defendant is hindered in [the] ability to gather evidence, contact witnesses, or otherwise prepare [a] defense.'" *State v. Leighton*, 2000 WI App 156, ¶23, 237 Wis. 2d 709, 616 N.W.2d 126 (numbering and citation omitted). The *Barker* Court identified this type of prejudice as the most significant because a defendant's inability to

adequately prepare for trial "skews the fairness of the entire system." *Barker*, 407 U.S. at 532.

¶73 Here, Coleman argues that the delay in holding the trial prejudiced his ability to present a defense because his mother, who would have been a witness at trial, passed away while his case was pending. Coleman stayed in a one-bedroom apartment with his mother and brother, and he was charged with repeated sexual assault of a child who lived in the same building and was frequently babysat by Coleman's mother. Coleman contends that his mother was a "key witness" who would have called the victim's account into question. According to Coleman, his mother would have testified that she was "virtually always present" in the apartment where two of the four assaults allegedly occurred; and "that there is no way Coleman could have committed the offense given the layout of the apartment and her presence therein." Thus, Coleman argues, the delay in holding the trial resulted in his inability to produce favorable testimony on the "critical issue" of "whether or not there was even an opportunity for this crime to happen."

¶74 We disagree that Coleman has established that he was prejudiced based on the inability to present his mother's testimony at trial for two reasons.

¶75 First, Coleman's assertion that his mother would have provided exculpatory trial testimony is speculative. *Urdahl*, 286 Wis. 2d 476, ¶36 (concluding that the defendant's claims about a missing witness did not show prejudice because they were "too speculative"). Here, the only evidence of what Coleman's mother would have said at trial is found in a police report that recounts the statements she made to a detective at the time of Coleman's arrest. Although the circuit court offered to allow Coleman to enter that portion of the police

officer's report into evidence despite the rules of hearsay, Coleman did not seek admission of the report. This suggests that, contrary to what Coleman argues in his postconviction motion and on appeal, Coleman's trial counsel understood that the statement Coleman's mother gave to the police would not have helped the defense.

¶76 Second, even if we assume that Coleman's mother would have testified as Coleman asserts in his appellate briefing, it is apparent that it would not have added much to the weight of exculpatory evidence presented at trial. As mentioned, Coleman contends that his mother would have testified that "there is no way [he] could have committed the offense given the layout of the apartment and her presence therein." But in light of trial evidence as a whole, there are reasons to doubt that such testimony would have been compelling to the jury. Notably, testimony that Coleman's mother was "virtually always present" in her apartment would have left much of the State's case intact, given that two of the four assaults allegedly occurred in the victim's apartment, where Coleman's mother was not present. As to the assaults that allegedly occurred in Coleman's apartment, the trial evidence established that Coleman's mother was in "very poor" health, had "limited mobility," and was "virtually bedridden" at the time the assaults allegedly occurred. This evidence was consistent with the account that the victim gave in her videotaped interview, in which she said that at least one of the assaults happened at a time when Coleman's mother was present in the apartment and asleep. Accordingly, contrary to Coleman's assertions, it does not appear that even the most compelling version of his mother's testimony would have persuaded the jury that "there is no way Mr. Coleman could have committed the offense." We therefore conclude that Coleman was minimally prejudiced by her absence at trial.

¶77 Finally, Coleman also argues that "a certain amount of prejudice is presumed" due to the length of time between his arrest and the trial which, he contends, "obviate[es] the need for a 'particularized' prejudice showing." We agree that Coleman suffered at least some prejudice as a matter of law. *See Hadley*, 66 Wis. 2d at 364 ("after a protracted period of time, most interests of a defendant are prejudiced as a matter of law whenever the delay, not the result of the defendant's conduct, is excessive"). However, we do not agree that this obviates the need to show "'particularized' prejudice" under the facts of this case. Coleman relies on *Doggett v. United States*, 505 U.S. 647, 655 (1992), but his reliance on *Doggett* is misplaced. In *Doggett*, the total time to trial was eight and a half years, which was "uncommonly long" and "extraordinary," and the Court determined that "the Government's egregious persistence in failing to prosecute Doggett [was] sufficient to warrant granting relief." *Id.* at 648-52, 657. Here, by contrast, the total time to trial was much less extreme, and we have not attributed any period of delay to "official negligence" or "egregious" conduct on the government's part. *Id.* at 656-57.

### E. Balancing the Four *Barker* Factors

¶78 The final step of the *Barker* analysis requires that we balance the four factors in light of the relevant circumstances of the case. Although nearly 32 months elapsed between Coleman's arrest and his trial, this case is critically different than any case where we have determined that the defendant's constitutional right to a speedy trial was violated. As discussed, almost all of the delay was directly caused by the COVID-19 pandemic. Even when we consider the additional periods of delay that were not caused by the pandemic, these periods were relatively brief and were caused by "neutral" reasons that we weigh less heavily under *Barker*. *Borhegyi*, 222 Wis. 2d at 512 (citing *Barker*, 407 U.S. at

33

531). Finally, even though we do not weigh Coleman's failure to assert his right to a speedy trial heavily, the lack of significant prejudice factors heavily in our analysis. On balance, we conclude that application of the **Barker** factors leads to the conclusion that Coleman's constitutional right to a speedy trial was not violated.

## II. Ineffective Assistance of Counsel

¶79     We now turn to Coleman's ineffective assistance of counsel claim. To prevail, Coleman must prove that his trial counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant has the burden to prove both prongs of the *Strickland* test, and "[i]f the defendant fails to adequately show one prong …, we need not address the [other]." *State v. Elm*, 201 Wis. 2d 452, 462, 549 N.W.2d 471 (Ct. App. 1996).

¶80     Coleman argues that his trial counsel was ineffective for failing to demand a speedy trial and for failing to move to dismiss the charges on speedy trial grounds. Generally speaking, counsel does not perform deficiently by failing to file a motion that would have been denied. *State v. Sanders*, 2018 WI 51, ¶29, 381 Wis. 2d 522, 912 N.W.2d 16 ("Counsel does not perform deficiently by failing to bring a meritless motion."); *State v. Jacobsen*, 2014 WI App 13, ¶49, 352 Wis. 2d 409, 842 N.W.2d 365 ("An attorney does not perform deficiently by failing to make a losing argument.").

¶81     Here, Coleman argues that, had trial counsel demanded a speedy trial, the circuit court would have scheduled the trial for an earlier date and Coleman's mother would have been available to testify. However, the postconviction court determined that had a speedy trial demand been filed, the

circuit court would have "set the matter over" for "good cause." *See* WIS. STAT. § 971.10(3) (providing that a court may continue a case despite a speedy trial demand if the ends of justice served by taking action "outweigh the best interests of the public and the defendant in a speedy trial").

¶82 The postconviction court's determination is not factually or legally erroneous. As discussed above, the primary reason for delay in Coleman's case was due to the court system's suspension of jury trials in response to the COVID-19 pandemic and, under these circumstances, WIS. STAT. § 971.10(3) provided legal authority to continue Coleman's trial despite a speedy trial demand. Additionally, the circuit court's decision to give scheduling priority to trials in other cases in which the defendant remained in pretrial custody was reasonable under the circumstances and would have provided good cause for additional continuances after the suspension of jury trials was lifted. Because Coleman has not shown that a statutory speedy trial demand would have led to an earlier trial date, we conclude that counsel was not deficient in this respect.

¶83 Coleman also argues that, had trial counsel filed a motion to dismiss the charges on constitutional grounds, the circuit court would have granted that motion. Again, we disagree. In responding to Coleman's postconviction motion, the postconviction court indicated that it would have denied a motion to dismiss on constitutional speedy trial grounds, and Coleman has not shown that any such decision would have been erroneous. Coleman has the burden to prove that his counsel's performance was deficient, and he does not persuade us that a timely assertion of the right would have compelled the circuit court to grant a motion to dismiss on speedy trial grounds.

¶84     Finally, Coleman may be arguing that trial counsel should have filed a statutory or constitutional speedy trial motion, even if it would have been denied at the circuit court level, in order to properly preserve the issue for appeal.[19]  *See State v. Norwood*, 2005 WI App 218, 287 Wis. 2d 679, 706 N.W.2d 683 ("[T]rial counsel must lodge an adequate objection in the trial court to preserve the issue for appeal." (citing *State v. Agnello*, 226 Wis. 2d 164, 172-73, 593 N.W.2d 427 (1999))).  If Coleman is making this argument, we conclude that he has not shown prejudice.  Although an assertion of the right to a speedy trial would have strengthened Coleman's claim on appeal, his failure to make an assertion was not dispositive in our analysis.  As we explained above, we did not weigh Coleman's failure to assert his speedy trial right heavily, and the other *Barker* factors played a more critical role in our conclusion—specifically, that the vast majority of the delay resulted from the COVID-19 pandemic and the lack of prejudice as a result of the delay.  Therefore, we conclude that Coleman has failed to show that his counsel was ineffective.

---

[19] More specifically, Coleman asserts:  "If this Court finds that the lack of speedy trial demand is dispositive to the *Barker* balancing test to determine whether Mr. Coleman's constitutional right to a speedy trial was violated, this Court should then find that the failure to assert such a demand was the result of the ineffective assistance of counsel."

Although we have explained that, as a general matter, trial counsel is not deficient for failing to file a motion that would have been denied, this may not always be the case in the context of constitutional speedy trial claims.  Given that one of the factors considered on appeal is whether the defendant asserted their right to a speedy trial, it may be deficient performance to not assert that right, even if a demand or motion to dismiss would have failed at the circuit court level, because the "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial" on appeal.  *See Barker*, 407 U.S. at 531-32.

## CONCLUSION

¶85 For the reasons explained above, we conclude that Coleman's constitutional right to a speedy trial was not violated under the facts of this case, and we further conclude that trial counsel was not ineffective for failing to file a speedy trial demand or a motion to dismiss on speedy trial grounds.

*By the Court.*—Judgment and order affirmed.

Recommended for publication in the official reports.